**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

October 22, 2024

LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

|  |  |  |
|---|---|---|
| A.S., | | |
| | Plaintiff, | Case No. 1:24cv46 |
| v. | | |
| UNITED STATES OF AMERICA, | | |
| | Defendant. | |

**COMPLAINT**

Plaintiff A.S. ("Plaintiff" or "A.S."), through undersigned counsel, files this Complaint against the United States of America. Plaintiff seeks damages for injuries caused by the tortious conduct committed by Defendant's employees, including intentional and negligent acts. Plaintiff hereby alleges, based on his personal knowledge, information, and belief, as follows.

**NATURE OF ACTION**

1. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). Moreover, under the Eighth Amendment, prisoners must have "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including "basic human needs," such as food, sanitation, and medical care. *Id.*

2. A.S., a resident at United States Penitentiary "USP" Lee ("USP Lee") at all times relevant to this Complaint, is among the hundreds of residents who have been routinely subjected to unwarranted and excessive physical assaults, and depravation of basic human needs in violation of the United States Constitution. A.S.'s tormentors are the former Warden, correctional officers, and other staff at USP Lee who were responsible for protecting A.S.'s rights, ensuring his safety,

and providing for his basic human needs.  These USP Lee employees intentionally betray, spectacularly, their basic obligations to A.S. and the other residents at USP Lee.  At USP Lee, residents are not only serving time—they are also being physically and mentally destroyed by the individuals tasked with carrying out their sentences.

3.    A.S. understands that, as a resident serving time in a federal penitentiary, his civil rights are subject to constraints that do not exist outside of a penitentiary.  But certain fundamental constitutional rights remain, even for an individual serving time, like A.S.  And a torture chamber sanctioned by the federal government in which officers brutally assault residents like A.S.; a prison administration in which almost-exclusively-white guards discriminate against and commit violent criminal acts disproportionately against persons of color; a prison in which officers enlist and threaten residents to "put in work" by committing violent physical acts against other residents; a prison staff that dehumanizes residents by parading them nearly nude through the facility while mocking their race and genitalia (and in some instances sexually assaulting residents along the way); depriving residents of food, sanitary living conditions, and basic medical care; and employing violence and restraints for periods lasting several days in contravention of codified prison policies—none of this comes even close to meeting the lowest possible standards for resident care at a federal penitentiary.

4.    To make matters worse, Defendant's staff at USP Lee have engaged in a coordinated effort to silence complaints by residents by depriving them of their limited redress for these egregiously horrifying conditions.  They do so by withholding the forms residents use to lodge grievances for misconduct by prison staff, destroying said forms in those circumstances where they do distribute them, refusing to submit or mail completed grievance forms in the required timeframes, and withholding mailed correspondence from the Regional Office from residents such

that their deadlines to respond pass before residents can proceed with the next step in their administrative grievance process. Officers go as far as intimidating and retaliating against residents who pursue legitimate administrative grievances against prison staff for abuse, including by isolating residents in the Special Housing Unit ("SHU") without justification or based on false premises; interfering with communications between residents and their counsel; and opening and reading clearly marked privileged legal mail communications. Residents who dare to speak out against staff abuse are moved to other facilities. As a practical matter, the limited rights residents have to pursue lawsuits for abuse pursuant to the Prison Litigation Reform Act are systematically thwarted by the administration at USP Lee through the means described above. As a result, it is virtually impossible for a resident, such as A.S., who has suffered abuse and consistent torment since he stepped foot on the USP Lee compound, to navigate a complex multi-step grievance process in order to exhaust his administrative remedies under 42 U.S.C. § 1997e(a) and then bring a civil lawsuit.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 171 and 28 U.S.C. § 1346(b) because A.S.'s claims allege negligent and other wrongful acts by employees of the federal government.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because all or a substantial amount of the events, acts, or omissions giving rise to Plaintiff's claims occurred, in whole or in part, in Pennington Gap, Virginia, in the Western District of Virginia.

## PARTIES

A.     Plaintiff.

7.     Plaintiff A.S. is a 30-year-old man who, at all times relevant to this Complaint, was a resident at USP Lee. Prior to his incarceration at nineteen years of age, A.S. resided in and was

a citizen of the State of Minnesota.  A.S. arrived at USP Lee on or around September 20, 2023.  In October 2023, USP Lee officers assaulted and directed other residents to assault A.S., and staff failed to provide proper follow-up medical care, as to cause lasting permanent damage to A.S.

B.    Defendant.

8.    Defendant United States of America ("Defendant" or "United States") created and oversees the Bureau of Prisons ("BOP"), a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities.  The United States employs all BOP correctional officers, guards, and staff named in this Complaint.  At all times relevant herein, the individuals mentioned herein were acting as agents of the United States.

## FACTS

### USP Lee

9.    USP Lee is a federal penitentiary located in Pennington Gap, Virginia.

10.    USP Lee is a high-security facility that houses approximately 1,500 adult males.[1] USP Lee has twelve housing units located in three buildings.  Each housing unit can house 128 offenders.[2]

11.    USP Lee has one SHU.  The purported purpose of the SHU is to 1) house residents in disciplinary segregation as a result of a formal disciplinary finding; 2) house residents on administrative detention pending transfer or investigation of a disciplinary infraction; and 3) house residents in protective custody.[3]

---

[1] Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[2] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/.
[3] *Program Statement on Special Housing Units*, Federal Bureau of Prisons at 3–6, 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf.

4

12.     In reality, the SHU, which is routinely kept at full capacity by USP Lee's administration, is used as a venue for extreme abuse and retaliation against residents by prison staff.  Indeed, individuals housed in the SHU often hear the screams of other residents as they are tortured by prison staff around the clock, typically within the two holding cells located in the SHU. These holding cells do not have toilets, and individuals who are abused in those cells, often over the course of consecutive days, are forced to defecate and urinate on themselves.

13.     The prison staff strategically conceal their abuse, and will often place toilet paper over the cameras in the SHU holding cells, which do not capture sound, to prevent their actions from being recorded.  In other instances, residents are taken by prison staff to blind spots in the SHU and passages leading to and from it, where cameras cannot record the abuse that occurs.  In still other instances, prison staff will threaten an individual to violently attack their cellmate within their own cell, where cameras are also not located.

14.     To further conceal their abuse, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries.

15.     The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  The medical staff tasked with providing care in the SHU, including mental health professionals, are deliberately indifferent to the abuse and torture that takes place, and the severe injuries that result.  USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring injuries to prisoners and/or by falsifying medical reports.  Indeed, medical staff are often present in the cell (and sometimes themselves participate in the assault of residents) while prisoners are being repeatedly kicked, punched, and tortured by prison staff, but they nevertheless report that victims have suffered no injuries.

16.     The conditions of confinement in the SHU are inhumane.  Individuals are not provided proper or clean clothing and are sometimes forced by prison staff to wear paper gowns that expose their genitalia—leading to sexually and racially abusive commentary, and at times sexual abuse, by prison staff.  When prisoners are given SHU uniforms, they are often forced to wear the same tattered, dirty clothing for several days in a row.  Individuals are given a total of 10–12 squares of toilet paper per day.  The toilets malfunction regularly, and individuals are forced to leave their feces in towels until maintenance staff arrives, which sometimes takes several days.  Individuals are forced to eat bologna sandwiches after prison staff smear them across a dirty floor.  In some cases, food is withheld from prisoners altogether for days on end.  Recreation time is inconsistent and generally nonexistent.  Windows in the SHU are sandblasted which prevents any natural light from entering cells, leaving residents to receive small slivers of sunlight through tiny cracks in the sandblast.

17.     Access to the law library in the SHU is non-existent due to prison staff routinely reporting that the law library computers are broken or inaccessible.

18.     Residents suffering from these horrible conditions and treatment are given only limited access to grievance forms to lodge complaints against USP Lee staff.  USP Lee officers will not only routinely refuse to give the grievance forms to individuals who request them, but when they do, will also at times provide the wrong form, and/or fail to transmit completed grievance forms to the appropriate personnel in the required timeframes.  Indeed, USP Lee officers threaten individuals, who attempt to pursue administrative grievances, with more and more severe violence.

19.     Although the SHU is generally reserved for individuals who either pose a threat to other residents, staff, or are at risk of harm, certain members of USP Lee staff confine individuals

like A.S. in the SHU for no legitimate reason.  Residents are remanded to the SHU (which is almost always fully occupied) so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or requests for medical and mental health care.

20.    When all of the cells in the SHU are full and prison staff want to transfer an individual in a particular unit to the SHU, the resident's particular unit is placed on "lockdown." When a unit is on lockdown, individuals in that unit do not receive hot meals, are not permitted to shower regularly, do not receive clean clothing, do not receive phone calls or visits from family, and cannot access the prison's programming or the law library.

21.    The nearly all-white prison staff at USP Lee discriminates against residents of color by disproportionately targeting them for physical violence, other forms of abuse, depriving them of medical attention and other basic rights, and housing them in the SHU.  Prison staff also regularly, consistently, and openly use vulgar racial epithets to refer to Black and Hispanic residents.  USP Lee officers take pride in their culture of violence against non-white residents by gruesomely pulling out residents' hair and hanging it for display on the penitentiary's fences.

22.    Prison staff often force prisoners to "put in work" by fighting each other, targeting certain residents for violence, including A.S.  USP Lee officers purposefully pair individuals who pose a safety threat to each other in the same cell—creating dissonance between them by sharing otherwise protected information about the individual's prior conviction or disseminating lies about the same based on prior disciplinary infractions.  USP Lee officers will alert one cellmate that the other is a child molester, referring to the offending resident as a "cho mo," and then demand that his non-offending cellmate beat the one labeled as a "cho mo."  USP Lee officers threaten to

7

physically assault and abuse any cellmates who do not comply.  As a result, most cellmates agree to fight each other rather than risk organized assault by the USP Lee officers.

23.    The culture of inhumane violence and abuse at USP Lee, experienced first-hand by A.S., has been previously documented at length.  In a September 6, 2019 "Follow-Up Inspection Report,"[4] investigators at the District of Columbia Corrections Information Council (the "CIC")[5] reported a litany of unconstitutional and sub-standard practices, including the following:

- Many residents expressed the expectation that they would face some form of retaliation for their participation in CIC interviews, from physical assaults by staff, to loss of facility jobs, to having their mail held for an excessive period.[6]

- Individuals reported being left in ambulatory restraints for 12 to 13 hours and more than 16 hours without access to toilets.[7]

- Several individuals mentioned a regular practice in which residents were assaulted, restrained, put in a paper gown, and forced to walk backwards in view of other residents.[8]

- One resident was slammed to the ground by an officer and then tied to a chair and left in an office for an hour before being transported to the SHU.[9]

---

[4] *See generally* Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019),
https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[5] The District of Columbia does not maintain its own prison system.  Instead, individuals sentenced for felony offenses under the D.C. Code are transferred to the federal Bureau of Prisons.  The CIC is an independent oversight entity maintained by the U.S. Congress and the Council of the District of Columbia to inspect, monitor and report on conditions of confinement at all facilities, including federal facilities, where D.C. Code offenders are housed.
[6] *Id.* at 8, I.
[7] *Id.* at 8, II.
[8] *Id.*
[9] *Id.*

- Residents said that staff beat residents with apples in socks or through a shield to prevent leaving marks of the assault.

- Individuals reported sexual assault or sexual harassment by staff, including seeing an officer grab a resident's testicles.

- One resident reported that a lieutenant put a shield on the resident's chest and kneeled on it while the resident was on his back and shackled.[10]

- Prison staff regularly use racial slurs.[11]

- During cell shakedowns, officers routinely sweep residents' belongings into the trash, including clothes, food, and hygiene products purchased off commissary, and fail to provide documentation of the confiscation of their property.[12]

- The USP Lee staff undermine or outright foreclose residents from pursuing the Bureau of Prisons Grievance Process. Residents have complained of being told by Warden Streeval that grievances would "never make it out of the SHU."[13] Other prison staff have told residents that their complaints will never go anywhere "because the Warden will lie for his staff."[14]

- Officers and USP Lee leadership have refused to separate cellmates who requested separation due to interpersonal conflict and the inherent safety risks caused by the conflicts and have told residents to fight or stab each other.[15]

---

[10] *Id.*
[11] *Id.* at 8, IV.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

- Residents are not provided adequate medical care.[16]

- Residents have been forced to clean up raw sewage flooding into the cells without adequate protection.[17]

- USP Lee was on lockdown for most of 2018 because the SHU was operating at or near capacity.[18]

24.    As described further below, nothing has changed at USP Lee since the CIC report was issued.  Indeed, undersigned counsel has filed in this Court no less than seven matters on behalf of USP Lee residents, all alleging excessive use of force in virtually the same context as alleged by A.S.  The injuries sustained by A.S. in 2023 and the unconstitutional and tortious practices that continue to be the norm at USP Lee are just the latest in a history of abuse that goes back many years.

### BOP Guidelines on Use of Force

25.    The injuries sustained by A.S. arose from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

26.    The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation have failed.[19]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of other residents, to prevent serious property damage, and to ensure institutional security and good order.[20]

---

[16] *Id.* at 11, V.
[17] *Id.* at 12, VI.
[18] *Id.* at 9, III.
[19] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[20] *Id.* ¶ 6(c).

27.     Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident: (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[21]

28.     Under no circumstances may physical restraints be employed to punish residents.[22]

29.     BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[23]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[24]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[25]

30.     As soon as an officer determines the resident has regained physical control and is no longer a threat to himself, other residents, or property, his restraints must be removed.[26]  Staff members violate BOP policy if they keep residents restrained longer than necessary, or if they restrain residents to punish or discipline them.[27]

31.     Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[28]  In addition, prison staff must report the use of force

---

[21] *Id.* ¶ 1.
[22] *Id.* ¶ 6(h)(1).
[23] *Id.* ¶ 6(d).
[24] *Id.* ¶ 9.
[25] *Id.* ¶ 10.
[26] *Id.* ¶ 5.
[27] *Id.* ¶ 6(b)
[28] *Id.* ¶ 6(j).

11

directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator.[29]  These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP, participates in the decision-making and monitoring process in the use of force, and that prison staff do not inappropriately use force on residents.

32.     As discussed further below, virtually none of these BOP regulations were complied with in using restraints on A.S.

### A.S.'s Arrival at USP Lee

33.     Around early September 2023, while residing at USP Canaan, A.S. learned that he would be transferred to USP Lee in the near future.  Due to USP Lee's infamy as a facility that tortures residents with sex-related convictions and disciplinary violations, and considering that A.S.'s past charges and previous incident reports have sexual connotations, A.S. was understandably apprehensive about this pending transfer.

34.     A.S. was transported from USP Canaan to the transfer facility at then-USP, now-FCI Atlanta on or around July 12, 2023.  While at FCI Atlanta, A.S. begged the staff to transfer him to any facility other than USP Lee.  Staff at FCI Atlanta failed to act upon A.S.'s pleas for help.  In desperation, A.S. decided that he would rather die than be transferred to USP Lee and twice attempted to end his life.  On September 5, 2023, he constructed a make-shift noose and attempted to hang himself, and on September 11, 2023, he ingested about twenty doses of his blood pressure prescription medication, Hydrochlorothiazide and Lisinopril.  Per the report prepared during FCI Atlanta staff's Suicide Risk Assessment of A.S. after these incidents, "Of note, [A.S.'s]

---

[29] *Id.* ¶ 14(a)(1)–(5).

12

efforts to avoid his designated institution is in an attempt to preserve his safety/life per his report. He advised that he wants to serve his remaining time in prison unmolested by staff or inmates because of his charges."

35.    On September 20, 2023, A.S.'s fears became reality, and he was transferred from FCI Atlanta to USP Lee. Despite A.S.'s prior understanding of the atrocities that had taken place at USP Lee, the violence that he would soon endure would be unfathomable.

36.    Upon arrival at USP Lee, staff placed A.S. in a large holding cell with the other arriving residents. Shortly thereafter, A.S. was removed from the large holding cell and placed in a smaller cell with one other resident. USP Lee staff commanded A.S. to kneel next to the cell's toilet with his hands cuffed and face pressed against the wall. While anxiously waiting in this position, A.S. could hear USP Lee staff at other cells singling out other new residents and announcing each person's disciplinary violations, line by line. After several minutes, USP Lee staff confronted A.S. and told him to stand up. A.S. obeyed the order to stand up. USP Lee staff, including Warden J.C. Streeval, Lieutenant Michael Chad Hamilton, Lieutenant Stapleton, Dr. Kareem Wasim, and Captain James Bowles, surrounded A.S., and staff members began reading A.S.'s prior incident reports.

37.    After his incident reports were revealed to everyone within earshot, A.S. understood that USP Lee staff had effectively "marked" A.S. Captain Bowles told A.S., "I already killed one piece of shit and would not mind another." In response to A.S.'s pleas for fair treatment and insistence that he was not a child molester, Dr. Wasim told A.S. to "shut the fuck up," and Lieutenant Hamilton told A.S. that they planned to take him to the SHU for "the platinum treatment." Warden Streeval interrupted Lieutenant Hamilton and said, "No, we are going to put

that child molesting piece of shit on the yard." After issuing the above threats to A.S., staff moved A.S. back to the large holding cell with the other incoming residents.

38.    According to a report in A.S.'s BOP file, Dr. Wasim supposedly conducted an initial Psychology Services Transfer Intake Screening of A.S. and concluded that his "mental status was devoid of any clinical markers suggestive of acute symptomology or clinical distress." The report states that A.S. "declined programming" and "denied interest in available treatment options." Per the report, Dr. Wasim stated, "No special recommendations for housing, bed, work, education, and program assignments are indicated at this time." Contrary to Dr. Wasim's report, A.S. did not receive a Psychology Services Transfer Intake Screening, did not decline programming, and did not deny interest in available treatments. When A.S. arrived at USP Lee, he was on the heels of two attempts at self-harm, and distressed and fearful about what would happen to him, thus, desperate for assistance. Dr. Wasim never met with A.S.

39.    A.S. was ultimately designated to I-Unit at USP Lee. Within one day of arriving on I-Unit, USP Lee staff began taunting and antagonizing A.S. Upon A.S.'s arrival on I-Unit, USP Lee staff made certain that the residents of I-Unit would make him an enemy. For instance, shortly after his arrival, A.S. heard Officer Barker announce that A.S. was a "cho-mo" to other residents, which caused another resident to confront A.S. and demand to know the nature of his convictions. After explaining his nuanced criminal history to the resident, the resident remained convinced that A.S. was a "cho-mo," as A.S.'s explanation was not enough to rebut USP Lee staff's assertions that A.S. is a "cho-mo." At that point, all residents on I-Unit labeled A.S. as a "cho-mo," and the resident told A.S. that he and other inmates could not associate with A.S. This interaction further fueled A.S.'s fears of enduring future violence and is representative of A.S.'s daily life on I-Unit,

14

consisting of A.S. being repeatedly interrogated by other residents concerning the nature of his conviction and threatened with violence by other residents and USP Lee staff.

40.    Along with the intimidation and threats of violence from other residents while A.S. lived on I-Unit, USP Lee staff's antagonistic behavior continued and signaled to A.S. that danger was indeed imminent.  USP Lee's behavior towards A.S. caused an ever-increasing tension on I-Unit.  This tension was exacerbated by USP Lee staff members enticing other residents to attack A.S.  USP Lee staff stooped to the point where other inmates were told by USP Lee staff that they would place I-Unit on perpetual lockdown until A.S. was hurt to their satisfaction.  Due to the behavior of USP Lee staff, A.S. knew that danger was inevitable and tried his best to stay safe.  However, on one specific occasion during this time, Warden Streeval told A.S., "Either the other residents get you, or my guys get you, and you are going to wish it's your guys."

41.    On October 4, 2023, with no apparent reason, Officer Dustin Farmer placed a "hands up" sign on the door of A.S.'s cell.  The "hands up" sign is used to indicate to staff that the person in the cell has recently been found guilty of committing a sexual act in the presence of a staff member, which is also known as a 205 disciplinary infraction (a "205").  Despite the sign's original purpose of protecting staff from undue sexual harassment, staff at USP Lee use the sign to taunt and harass residents for past 205s that were issued months, if not years, prior to their arrival at USP Lee.  Staff use the sign as a signal to other staff and residents that a particular inmate is "lesser than" and should be met with negative treatment and other forms of harassment.

42.    The next day, on October 5, 2023, while A.S. was in the Education Room, USP Lee staff summoned A.S. to the Lieutenant's Office over the loudspeaker.  A.S. immediately walked to the Lieutenant's Office.  Upon arrival, USP Lee staff confronted A.S. about his history of 205s, other infractions, and an anonymous tip reporting that A.S.'s safety was in danger.  The unknown

15

Special Investigator Services officer present during this conversation told A.S. that, based on his history and the recent tip, A.S. was being placed in the SHU, ostensibly for his protection.

43.    A report prepared by Nurse Kaela Baker and cosigned by Dr. Timothy York of USP Lee states that A.S. "was seen in the Lieutenant's Office" on October 5, 2023, and "request[ed] protective custody." This report is misleading at best. While A.S. did not object to this placement, he most certainly did not request it.

44.    A.S.'s first few hours in the SHU were uneventful, which surprised A.S. due to the stories he heard from other residents. However, this initial peace was interrupted when an unknown officer confronted A.S. and said, "You are lucky staff was busy tonight. It is not over. We know you are down here because nobody likes you—fucking 'cho-mo!'"

45.    On October 6, 2023, A.S.'s fears worsened after he heard an unknown officer refer to A.S. and say, "When they start fighting, empty three cans on both of them," which A.S. understood as the guard's plan to fabricate a fight between A.S. and his cellmate and a ploy to transfer A.S. to a cell by himself.

### October 9, 2023 Assault and Placement in Ambulatory Restraints

46.    On October 9, 2023, A.S.'s fears became a reality. At approximately 8:45 a.m., while lying on his bed, A.S. heard an officer walking in the hallway and stop in front of A.S.'s cell. Suddenly, A.S. heard the same officer yell, "Stop fighting!" and the sound of mace being sprayed inside his cell. With mace filling the room, A.S. heard the officer press the emergency signal, calling for back-up. Several officers entered A.S.'s cell and placed A.S. and his cellmate in handcuffs. While escorting A.S., Officer Ricky Bradburn said, "You know where you are going big boy."

47.    The officers moved A.S. and his cellmate to separate holding cells in the SHU. The holding cell that A.S. was placed in did not have any chairs or beds and is commonly referred to

16

as a "dry cell." Upon entering the cell, A.S. saw that there was a green mat about the size of a beach towel covering part of the floor and believed this to be a "suicide mat"; the cell also contained a toilet and a sink. Correctional staff can control the flow of water to both the toilet and sink in these holding cells. After placing A.S. alone in the holding cell with handcuffs on, Officer Joshua Robbins and Officer Brian Woodard lifted A.S. from the ground by his arms and slammed his face against the wall, causing A.S. to lose consciousness and half of his two front teeth. When A.S. regained consciousness, he awoke to Officer Brian Woodard, Officer Ricky Bradburn, Officer Joshua Robbins, Officer Logan Smith, and several Unknown Officers kicking him while he was lying on the ground. These officers continued to kick A.S.'s head, face, genital area, back, arms, and legs, while A.S. screamed in pain and for mercy. During this attack, several officers, including Officer Bradburn, repeatedly called A.S. a "cho-mo" and other sexually explicit names, and racial slurs. Despite the physical and verbal assaults, A.S. remained on the ground and attempted to indicate that he was no threat to the officers. After three to five minutes, the initial assault ended, and all the officers left A.S.'s cell. A few minutes later, Officer Brown entered the holding cell and began kicking A.S.'s body. Once Officer Brown stopped kicking A.S., two Unknown Officers took over and continued kicking A.S. After kicking A.S. for several minutes, Officer Brown and the two Unknown Officers again left A.S.'s cell. However, minutes later, several other Unknown Officers entered A.S.'s cell and again began kicking A.S. Throughout these assaults, A.S. remained in a docile, submissive state when his attackers entered his cell; he simply lay on the ground until the guards finished attacking him and left his cell.

48.    After the two Unknown Officers stopped kicking him, A.S. heard Warden Streeval say in a self-congratulatory manner and referring to the beating A.S. just received, "I made good on my word." Warden Streeval further informed A.S. that there would be a medical examination

17

and threatened A.S. with more violence in the event he reported any injuries to medical staff. Subsequently, Nurse Spencer Bowman entered the cell and "assessed" A.S. Fearing additional violence, A.S. obeyed Warden Streeval's threat and did not report any injuries to Nurse Bowman. Indeed, the report prepared by Nurse Bowman and cosigned by Dr. Vibeke Dankwa concerning this assessment states that A.S., "did not make any statement of injury nor occurrence." However, the report does recount that "[A.S. was] involved in physical altercation in SHU. [A.S.] has abraded inner lower lip, red marks to forehead and[ ] abrasions to both elbows. . . ."

49. After the medical assessment, A.S. remained in the holding cell in significant pain. Around 10:45 a.m., two hours after the officer first deployed mace on A.S. and his cellmate, staff moved A.S. back to his original SHU cell and placed a new cellmate inside the cell with A.S. After both men were inside the locked cell, A.S.'s new cellmate turned to A.S. and explained that staff placed him in the cell with instructions to attack A.S. Outside of the cell, Officer Bradburn confirmed staff's desire for the new cellmate to fight A.S. by saying to A.S.'s new cellmate, "It's either going to be me, you, or both of us," alluding to potential consequences should the new cellmate refuse his orders. In an attempt to satiate Officer Bradburn's desire for the men to fight, A.S. feigned throwing a punch at the new cellmate. At this point, Officer Bradburn had seen enough and decided that USP Lee staff needed to take the matter of "making A.S. pay" for his past transgressions into their own hands since the other residents failed to injure A.S. according to USP Lee staff's desire. Officer Bradburn ordered A.S. to prepare to be placed in handcuffs. A.S. complied. Officer Bradburn handcuffed A.S. through the designated slot in the cell door and said, "All right, you know what's going to happen now. You're going in the restraints."

50. Once A.S. was handcuffed, a group of officers moved A.S. back to the same holding cell where he had been attacked earlier that day. While being escorted, A.S., who was out of sight,

heard Warden Streeval ask the officers, "Where is [A.S.]?", and Officer Bradburn reply, "[A.S.] the sex offender, child molesting piece of shit is up front." Once back inside the holding cell, A.S. was required to kneel on a suicide mat, and Officer Smith placed A.S. in ambulatory restraints. Warden Streeval then came into the holding cell.

51.     Once A.S. was secure in the restraints, and while he was still kneeling on the floor, an Unknown Officer ripped chunks of A.S.'s maced-covered beard out of his face and shoved the handfuls of mace-covered hair in A.S.'s mouth, causing A.S. to choke. The group of officers then began assaulting A.S. with punches and kicks to his body while A.S. was in ambulatory restraints and doing his best to remain on his knees as instructed.

52.     Officer Smith grabbed A.S.'s penis and testicles and mutilated his genitals by squeezing and twisting. Officer Smith squeezed A.S.'s genitals hard enough for his penis to begin bleeding, which caused A.S. to scream in agony. In response to A.S.'s screams, instead of relenting, two Unknown Officers forced A.S.'s face into the ground to combat the volume of his screams.

53.     Unexpectedly, an Unknown Officer said to Officer Smith, "What are you doing," to which Officer Smith responded by letting go of A.S.'s genitals. The officers stopped attacking A.S. and instructed A.S. to kneel on the suicide mat and face the wall. At this point, blood from A.S.'s penis formed a pool of blood on the cell floor. An officer who was watching A.S. from outside of A.S.'s cell noticed and pointed out the blood. Warden Streeval then ordered one of the officers to mop up the blood. Officer Smith then left and returned with a mop. At this point, Officer Smith and an Unknown Officer then entered the cell, and Officer Smith mopped the pool of blood. Before leaving the cell, while A.S. remained motionless on his knees, one of the officers wiped the head of the blood-soaked mop on A.S.'s face and the other "field goal-kicked" A.S. in

his genitals as A.S. knelt on the suicide mat.  Despite the extreme pain that he felt at this time, A.S. remained on his knees facing the wall as instructed.

54.    Seconds later, A.S. heard Officer Bradburn from outside of the cell say, "Since he likes touching little kids, we should put the broom up his ass," and A.S. turned his head around from the wall, expecting further violence.

55.    Two Unknown Officers immediately grabbed A.S. on either side of his body and held him against the wall, and Officer Smith rammed the wooden mop handle through the seat of A.S.'s pants, penetrating several inches inside A.S.'s anus.  A second later, Officer Smith forced the mop handle to an even deeper depth inside A.S.'s anus, while A.S. screamed for mercy.  This barbarity lasted for about ten seconds before the mop handle was removed from A.S.'s anus.

56.    After Officer Smith raped A.S. with the mop handle, A.S. was left alone in the cell, lying on the floor, defeated, bleeding, and in excruciating pain.  About five minutes later, Warden Streeval and an Unknown Officer entered the cell to prepare A.S. for another medical examination. Warden Streeval again threatened A.S. with further violence if A.S. reported any injuries during the medical assessment.  Once Warden Streeval was convinced that A.S. would comply, Warden Streeval and the Unknown Officer escorted A.S. to the medical assessment, which took place in the cell immediately adjacent to the one he had been in.  Weak from the assault, A.S. was all but carried to the medical assessment.  He was on his feet but limped over at the waist and unable to hold his head up, his body forming a 90-degree angle.

57.    Upon entering the medical cell, Nurse Bowman was waiting there for him.  Upon information and belief, Nurse Bowman had been waiting for him throughout his sexual assault. A.S. was helped onto an examination table identical to that found in a typical doctor's office and covered with standard, white examination chair paper.  A.S. could not sit up and remained bent

20

over throughout the entire medical assessment.  Nurse Bowman asked, "Are you ok?"  A.S. said, "Yes sir."  Nurse Bowman checked A.S.'s vitals and asked, "What happened?"  A.S., in fear of retaliation, said, "I do not know."  Nurse Bowman did not inquire further.  When asked if he had any injuries, A.S. complied with Warden Streeval's threat and reported that he had none.  Despite blood leaking through both the front and the seat of his pants, Nurse Bowman ended the assessment.

58.    Once the assessment concluded, A.S. was escorted out of the medical cell, while bent over at a 90-degree angle, and back into the holding cell.  Nurse Bowman's report of his encounter with A.S. noted that A.S. was involved in a physical altercation, that he was placed in ambulatory restraints, that he did not have any injuries, and "did not make statement" regarding the cause of any injury.  Nurse Bowman's report does not mention the blood stains covering A.S.'s pants in either the front or the back, despite the significant bleeding from both his penis and the trauma of the rape.  The report similarly lacks any mention of blood on the white examination paper covering the table where A.S. sat, even though A.S.'s rectum was actively bleeding during this time.  Indeed, upon information and belief, A.S. remained in the same blood-stained pair of pants with a hole in the anus for about three to four weeks.  The first two days after the assault he was bleeding steadily through his pants, wetting them; he continued to endure tapered bleeding for the following week.

59.    After Nurse Bowman's assessment, A.S. experienced more torture at the hands of officers.  After being escorted from the medical cell and back into the holding cell, A.S. was forced to remain kneeled down on the suicide mat in ambulatory restraints.  USP Lee staff performed "restraint checks" in two-hour increments.  During each of the next four "restraint checks," certain officers lodged violent attacks on A.S.  At each interval, officers would yell from outside A.S.' cell

21

door, instructing him to kneel with his face up against the wall.  When the doors of A.S.'s cell opened, several officers would rush into the cell behind a fiberglass shield.  While A.S. was on his knees, officers would "bulldoze" A.S. with the shield, using it to pin his body and face against the wall.  Officers then punched and kicked A.S. and pressed the edge of the shield into the bottoms of A.S.'s feet.  A.S. never fought back, but he repeatedly begged the officers to stop and leave him alone.

60. In two-hour increments, from approximately 2:00 p.m. to 10:00 p.m., Officers entered A.S.'s cell and took turns punching and kicking him on both sides, pulling his braids from his scalp, slamming his head into the wall, ramming the shield into his back, placing the shield on his toes and back while pushing down on the shield to lift their body weight off of the ground, using the shield for balance, and bending his fingers back in an apparent attempt to break them. During these attacks, A.S. almost always fell from his knees into the fetal position in an attempt to minimize his injuries, and the officers would resort to kicking A.S. before telling him to "get up" and "take it like a man."

61. During one instance, an Unknown Officer used his fist to hammer the top of A.S.'s head, causing A.S. to become lightheaded and eventually collapse from his knees to the ground. Officers commanded A.S. to return to his knees, and the same Unknown Officer began ripping A.S.'s mace-covered beard hair out of his face (again) and shoving the mace-covered hair down A.S.'s throat.

62. In another instance, an Unknown Officer spit on A.S. while he lay on the ground in ambulatory restraints.

63. Throughout each encounter, Officers verbally assaulted A.S. with sexually explicit, and derogatory remarks, such as "cho-mo" and "you like fucking little kids do you, let's see how

you like this," and racist remarks, including "Nigger," "You don't belong here, Nigger," and "We don't like your kind around here."

64. During a few of these assaults between 3:00 p.m. and 12:00 a.m., a member of the medical staff, including Nurse Bowman and, upon information and belief, Nurse Leon Caudill, stood outside of the cell and waited for a signal to enter. Upon entry, the medical staff member, including Nurse Bowman and, upon information and belief, Nurse Caudill, entered A.S.'s cell and "observed" his condition. Despite A.S.'s obvious injuries and their close proximity to A.S. while he was being assaulted, medical staff members, including Nurse Bowman and, upon information and belief, Nurse Caudill, failed to adequately report or treat the injuries A.S. sustained from the assaults.

65. Per reports prepared by Nurse Caudill concerning restraint checks supposedly performed at 3:00 p.m., 7:00 p.m., 9:00 p.m., and 12:20 a.m., A.S. did not have any injuries at those times; according to the report, A.S.'s "Chief Complaint" concerned an "Other Problem." Significantly, the report does not mention the blood on the front or back of A.S.'s pants and makes no clarification on the nature of A.S.'s "Other Problem."

66. From about 10:00 p.m. to 7:00 a.m., a new group of officers began their shifts in the SHU. The officers on duty during this time continued to intimidate, threaten, and harass A.S. with verbal assaults. These officers insulted A.S. with racist remarks in an antagonist manner, attempting to cause A.S. to respond in a way that would justify more physical abuse. Despite the officers' persistence, A.S. remained on his knees as instructed and did not respond.

67. Around 4:00 a.m. on October 10, 2024, Lieutenant Mullins approached A.S.'s cell and asked A.S., "Who did you piss off," referring to the torture A.S. endured throughout the near-24 hours prior. A.S. told Lieutenant Mullins that A.S.'s assumption was that his recent informal

23

complaints directed at certain officers, including Officer Austin Dean, were the reason for the abuse.

68.    Around 6:00 a.m., Officer Robbins and Officer Dean approached A.S.'s cell. While outside of his cell, one of the officers said to A.S., "You're a snitch and we're going to beat your ass." Officer Dean and Officer Robbins both then entered A.S.'s cell, and one of them grabbed A.S. by his neck and the belly chain wrapped around A.S.'s waist. Officer Dean and Officer Robbins announced that they would "have a contest" to determine who among the two officers could toss A.S. the furthest. Next, Officer Dean and Officer Robbins took turns grabbing A.S. by his neck and belly chain and hurling A.S. against the wall. Each time A.S. hit the wall and slid down to the floor, the two officers kicked A.S. until one of them eventually decided to lift A.S. up and throw him again. During the assault, one of the officers asked A.S., "Which [prison] is worse, Thomson or Lee County," referring to USP Thomson, a place notorious for abusive behavior.[30] The officers threw A.S. against the wall at least eleven times.

69.    Between 8:30 a.m. and 9:00 a.m., without any acknowledgement of the last 24 hours, A.S. was moved from the SHU holding cell and into a regular SHU cell with a new cellmate, and finally taken out restraints. A.S.'s new cellmate was visibly aghast when he saw A.S.'s injuries.

70.    Despite the obviousness of his injuries, including bleeding from his penis and his anus; contusions and lacerations to his face, arms and legs, and the knowledge by at least certain officers that A.S. was raped with a foreign object, A.S. was not seen or treated by medical personnel for injuries sustained during the assault for more than 40 days—on November 24, 2023—and only

---

[30] *Cruel and Usual: An Investigation into Prison Abuse at USP Thomson*, Washington Lawyers' Committee for Civil Rights & Urban Affairs, https://www.washlaw.org/wp-content/uploads/2023/07/Cruel-and-Usual-An-Investigation-Into-Prison-Abuse-at-USP-Thomson.pdf (last visited Oct. 22, 2024).

after A.S. put in a request to be seen because of lingering pain in his knee and chest.  Medical records indicate that A.S. told the medical provider that these injuries were the result of an "assault on Oct [*sic*] 9 [*sic*] 2023."[31]

71.    Indeed, following A.S.'s brutal assault, the officers strategically attempted to cover-up or otherwise launder their abuse.  The officers fabricated a 224 (assault) incident report and 201 (fighting) incident report for the "fights" staged by the officers.  These incident reports were fabricated to justify the officers' assaults on A.S. and explain his resulting injuries.  Due to these false reports, A.S. lost phone, email, commissary, and visit privileges, along with fifty-four days of good credit time.

72.    A.S. remained in the SHU until November 27, 2023, when he was ultimately transferred from USP Lee.

### Trauma and Injuries Following the October 9, 2023 Assault

73.    A.S. suffered severe injuries from the officers' assaults that have caused him lasting physical and mental anguish.  After the assaults, A.S. was left with cuts, contusions, and bruises across his body that were extremely painful.  A.S.'s penis continued to bleed for several days, and his anus continued to bleed for about seven to ten days after the torture ended.  The injury to A.S.'s penis also caused extreme burning for several days when he urinated.  A.S. experienced constipation and bloody stools for multiple weeks due to the injuries to his anus.  The kicks and punches he endured caused injuries to his lower back and knees, which caused persistent pain for multiple months following the attacks.

---

[31] An October 12, 2023 medical report claims that A.S. "refused to complete [medical] screening" after medical staff approached A.S.; however, this encounter never occurred, and A.S. did not refuse any treatment.  Indeed, at the time, the injuries from the attacks were fresh and it would have been apparent to anyone who approached A.S. that he needed treatment.

74. To date, nearly one year later, A.S. still experiences pain in his back and his knees. Additionally, A.S. has a lump on one of his feet where he was repeatedly struck with the officers' shield. The lump in A.S.'s foot causes him pain if A.S. stands for any longer than twenty minutes. Both of A.S.'s front teeth are broken to this day due to his face being slammed against the cell wall. He also suffers from a stinging, burning sensation in both feet that persists to this day.

75. A.S. lives in constant fear that he will be assaulted again, which causes him anxiety and panic attacks. Each time he hears the sound of a cell being unlocked or keys jingling, his mind reverts to the state he was in during the assaults, which causes debilitating terror and an inability to move. Such anxiety experienced by A.S. is apparent to this day. Despite his transfer from USP Lee, A.S. still lives in trepidation and fears for his life, even more than 400 miles away at a different facility. For instance, A.S. has recurring night terrors, in which he relives the officers' inhumane assaults, and he is constantly looking over his shoulder expecting danger. Indeed, BOP staff performing clinical observations of A.S. after his torture have reported that he suffers from hypervigilance, which causes him to continually assess his environment for potential threats. A.S.'s mental injuries have, and will significantly impact him for the remainder of his life.

## CAUSES OF ACTION

## COUNT ONE

*Assault and Battery Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

76. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

77. The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, where the conduct at issue

is premised on the acts or omissions of investigative or law enforcement officers of the United States.

78.     Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery.  Battery is an unwanted touching which is neither consented to, nor excused, nor justified.

79.     As outlined above, on or around October 9, 2023 through October 10, 2023, Officer Logan Smith, Officer Woodard, Officer Dean, Officer Robbins, Officer Bradburn, Officer Brown, Officer Lawson, and at least four Unknown Officers, touched A.S. in a vicious, sadistic, rude, insulting, brutal, unwanted, and offensive manner, thereby causing A.S. significant harm.  Beyond mere touching, Officer Smith, Officer Woodard, Officer Dean, Officer Robbins, Officer Bradburn, Officer Brown, Officer Lawson, and at least four unknown officers on several occasions relevant to this Complaint, without provocation or justification, placed him in ambulatory restraints, which were unwarranted and too tight; slammed his body and face into the wall with a riot shield while he sat on his knees, in restraints; repeatedly kicked A.S. while he was on the ground; shoved mace-laden facial hair into his mouth; and grabbed him by the neck and the belly chain and hurled him into the wall.  In addition to these acts, Officer Logan Smith squeezed A.S.'s penis until it bled, and penetrated A.S.'s anus with a mop handle, while two Unknown Officers held A.S. and prevented him from moving.

80.     These touchings by Officer Smith, Officer Woodard, Officer Dean, Officer Robbins, Officer Bradburn, Officer Brown, Officer Lawson, and at least four unknown officers were unsolicited by A.S., unwanted, and wholly inappropriate.  The touchings were neither consented to, excused, nor justified.  Furthermore, these officers engaged in acts, including

berating and threatening A.S., and using derogatory remarks such as "nigger" against him, intending to create a reasonable apprehension of immediate, unwanted touching of A.S.

81.  During the tortious conduct committed by Officer Smith, Officer Woodard, Officer Dean, Officer Robbins, Officer Bradburn, Officer Brown, Officer Lawson, and at least four unknown officers, each of these officers were acting within the scope of their employment duties as officers and agents of the federal government and, therefore, such conduct is imputable to Defendant United States of America.

82.  The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct.  As a proximate result of such conduct, A.S. has suffered various bruises and contusions on his face, arms and legs, bleeding from his penis and from his anus that persisted at least one week, a bruised anal area, constipation, a burning sensation during urination (as if from a bruised kidney), injuries to his legs and feet, broken teeth, persistent burning sensation on the bottom of his feet, as well as emotional pain and suffering for which the United States of America is liable.

**COUNT TWO**

*Medical Malpractice Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

83.  Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

84.  The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

85.    Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

86.    Nurse Bowman and Nurse Caudill, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, owed A.S. a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

87.    Nurse Caudill and Nurse Bowman breached their duty of care by failing to ensure that A.S. received from them reasonable care, skill, or knowledge ordinarily used under similar circumstances, when they entered A.S.'s cell after witnessing at least one assault of A.S. and failed to appropriately check his restraints; failed to assess his injuries; and failed to appropriately treat his injuries.

88.    Nurse Bowman further breached his duty of care by failing to ensure that A.S. received from him reasonable care, skill, or knowledge ordinarily used under similar circumstances, when he observed him in the SHU medical room, weak and battered, with blood covering the front and back of his pants, immediately after he was raped and released from ambulatory restraints, and failed to perform more than a perfunctory assessment of his injuries and thereafter falsified records of the encounter.

89.    As a proximate and causal result of the malpractice of Nurse Bowman and Nurse Caudill, A.S. has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

29

## COUNT THREE

*Negligence Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

90.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

91.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

92.    Under Virginia law a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

93.    Warden Streeval, Officer Smith, Officer Woodard, Officer Dean, Officer Robbins, Officer Bradburn, Officer Brown, Officer Lawson, Nurse Bowman, Nurse Caudill, and at least four Unknown Officers, in the exercise of reasonable care, and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, had a duty to keep A.S. safe, and breached that duty by repeatedly grabbing, striking, kicking, restraining, and otherwise torturing A.S., and failing to intervene to protect A.S. from that conduct, respectively. These officers knew that their failure to uphold this duty placed A.S. at an unreasonable risk of physical and mental injury.

94.    Warden Streeval, Officer Smith, Officer Woodard, Officer Dean, Officer Robbins, Officer Bradburn, Officer Brown, Officer Lawson, Nurse Bowman, Nurse Caudill, and at least four Unknown Officers, in their capacity as and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, breached their duties by using gratuitous force against A.S. and failing to intervene, regarding the use of restraints and further abuse, and they did so deliberately or carelessly, without proper regard to the risk of harm to A.S.

30

95.     These individuals knew or should have known that A.S. would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

96.     As a direct and proximate result of the negligence and carelessness of these officers, A.S. has suffered extreme physical, emotional, and mental distress.  As a direct and proximate result of these acts or omissions, A.S. has suffered injuries for which he seeks compensatory and actual damages against the United States.

## COUNT FOUR

*Negligence Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

97.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

98.     The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

99.     Under Virginia law a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

100.    Warden Streeval, Nurse Bowman, and Nurse Caudill, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that failing to provide adequate medical care to A.S. after he endured hours of physical abuse, which culminated in blood pooling on the floor from his penis and anal penetration with the handle of a mop, was unreasonably dangerous, and placed A.S. at risk of physical injury, permanent physical disability, and mental injury.

31

101.   Warden Streeval, Nurse Bowman and Nurse Caudill, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to A.S., including, but not limited to, failing to properly assess A.S.'s injuries; failure to diagnose or otherwise treat his physical injuries; falsifying records to justify these failures; and ignoring A.S.'s informal and formal requests for treatment.

102.   These individuals knew or should have known that A.S. would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

103.   As a direct and proximate result of the negligence and carelessness of these staff members, A.S. has suffered extreme physical, emotional, and mental distress.  As a direct and proximate result of these acts or omissions, A.S. has suffered injuries for which he seeks compensatory and actual damages against the United States.

## COUNT FIVE

*Sexual Assault and Battery Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

104.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

105.   The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

106.   Virginia law recognizes sexual assault and battery claims where a plaintiff establishes that a defendant has, against the will of the plaintiff, by force, threat or intimidation, or

32

through the use of the plaintiff's mental incapacity or physical helplessness, committed an act with the intent to sexually molest, arouse, or gratify any person, by intentionally touching the plaintiff's intimate parts or material directly covering such intimate parts.

107.    As detailed above, Officer Smith used force and purposely, with the intent to sexually molest, squeezed A.S.'s genitals with his hands and penetrated A.S.'s anus with a mop handle.  A.S. did not consent to either of these acts committed by A.S.

108.    While engaging in this conduct, Officer Smith was acting within the scope of his employment duties as an officer and agent of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

109.    The actions by Officer Smith were lascivious, malicious, intentional, and amounted to extreme and outrageous conduct.  Officer Smith used force, threats, and intimidation when he sexually assaulted and battered A.S.  As a proximate result of such conduct, A.S. has suffered serious injuries, including bleeding from his penis and from his anus that persisted at least one week, a bruised anal area, constipation, and a burning sensation during urination, as well as emotional pain and suffering for which the United States of America is liable.

## COUNT SIX

*Sexual Abuse by a Person of Authority Pursuant to the Federal Tort Claims Act 28 U.S.C.*
*§ 1346(b)*
*(Against Defendant United States of America)*

110.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

111.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

112.     Virginia law recognizes an action for sexual abuse by a person of authority where a plaintiff establishes that a person in a position of trust having influence over the victim's life sexually abused the plaintiff when the plaintiff was at least eighteen years old.

113.     Officer Smith, as an officer with the federal BOP, provides supervision, care and correctional treatment to residents in BOP custody, which includes enforcing rules and regulations governing facility security, resident accountability and resident conduct.  BOP officers may also be authorized to carry firearms and to use physical force, including deadly force, to maintain control of residents.

114.     In October 2023, Officer Smith was a correctional officer at USP Lee, where A.S. was a resident.  Officer Smith was thus a person of authority with significant influence over A.S.'s life.

115.     As detailed above, Officer Smith betrayed his position of trust when he mutilated A.S.'s genitals by squeezing his penis and testicles, and when he penetrated A.S.'s anus with a mop handle.  A.S. did not consent to either of these acts.

116.     While engaging in this conduct, Officer Smith was acting within the scope of his employment duties as an officer and agent of the federal government, and therefore, his conduct is imputable to Defendant United States of America.

117.     The actions by Officer Smith were lascivious, malicious, intentional, and amounted to extreme and outrageous conduct. Officer Smith used force, threats, and intimidation when he sexually assaulted A.S.  As a proximate result of such conduct, A.S. has suffered serious injuries, including bleeding from his penis that lasted several days and bleeding from his anus that persisted at least one week, a bruised anal area, constipation, and a burning sensation during urination, as well as emotional pain and suffering for which the United States of America is liable.

34

## **RELIEF SOUGHT**

A.      Plaintiff seeks to be fully and fairly compensated for his injuries, pain, suffering,

emotional, and mental distress to the fullest extent permitted under federal law;

B.      Plaintiff requests $500,000 in compensatory damages from Defendant;

C.      Plaintiff requests pre-judgment interest and post-judgment interest, together with

an award of fees incurred in this case (including attorneys' fees), expenses, disbursements, and

costs arising from this action; and

D.      Plaintiff requests any and all other relief this Court deems just and proper.


Dated:  October 22, 2024                         Respectfully submitted,

                                                 [Signatures on the following page]

/s/ W. Hunter Winstead

**W. Hunter Winstead**
Virginia Bar Number: 66770
December L. Huddleston
(*pro hac vice* forthcoming)
William H. Swain
(*pro hac vice* forthcoming)
Chelsea A. Krzaczek
(*pro hac vice* forthcoming)
GILBERT LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone:   (202) 772-2301
Email: WinsteadH@GilbertLegal.com
Email: HuddlestonD@GilbertLegal.com
Email: SwainW@GilbertLegal.com
Email: KrzaczekC@GilbertLegal.com

/s/ Kristin L. McGough

Kristin L. McGough
(*pro hac vice* forthcoming)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005
Telephone:   (202) 319-1000
Email: Kristin_McGough@washlaw.org

*Counsel for Plaintiff A.S.*

36