CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
November 09, 2026
LAURA A. AUSTIN, CLERK
BY: s/ FELICIA CLARK
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **A.S.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:24CV00046 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| | ) | |
| Defendant. | ) | |

*Glenn E. Chappell, GILBERT LLP, Washington, D.C., Kristin L. McGough, WINSTON TAYLOR LLP, Washington, D.C., and Leslie Faith Jones,* WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, *Washington, D.C., for Plaintiff; Laura Day Taylor and G. Riley Worrell, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for United States.*

The plaintiff, a federal inmate proceeding under a pseudonym, asserts claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680. In summary, he claims correctional staff at his prison committed (1) assault and battery; (2) medical malpractice; (3) negligence related to use of force; (4) negligence related to medical care; (5) sexual assault and battery; and (6) sexual abuse by a person of authority. The United States has moved to dismiss Count Two of the Complaint, the medical malpractice claim, and Count Four of the Complaint, the claim for negligent medical care, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). After reviewing the record, I conclude that the

plaintiff has failed to exhaust his required administrative remedies for his claims for medical malpractice and negligent medical care, so subject-matter jurisdiction does not exist. Therefore, the Motion to Dismiss as to these counts must be granted.[1]

I.

A.S. alleges the following facts in his Complaint, which I must accept as true for the purpose of deciding the Motion to Dismiss.

A.S.'s claims arose while being incarcerated at United States Penitentiary Lee (USP Lee), a maximum security prison located in this judicial district and operated by the Bureau of Prisons (BOP), an agency of the United States.

A.S. arrived at USP Lee in September of 2023. Within one day of his arrival, he was targeted by staff. He heard an officer "announce that [he] was a 'cho-mo' to other residents, " *Id.* ¶ 39, meaning that he was a child molester. This caused him to be threatened with violence by other residents and by USP Lee staff.

A few days later, on October 9, 2023, A.S. was awakened by the sound of an officer walking in the hallway and yelling at him to "[s]top fighting!" *Id.* ¶ 46. The

[1] The United States has submitted extraneous documents along with its brief in support of its Motion to Dismiss, including BOP records and a copy of the plaintiff's administrative claim. Except for the plaintiff's administrative claim, I have not considered these documents in ruling on the Motion to Dismiss and they are excluded. I will not treat the present motion as a motion for summary judgment. *See* Fed. R. Civil P. 12(d) (providing that a motion under Rule 12(b)(6) that presents matters outside of the pleadings that are not excluded by the court "must be treated as one for summary judgment under Rule 56").

officer then sprayed mace "inside his cell" and pressed the emergency signal, "calling for backup." *Id.* Next, "[s]everal officers entered A.S.'s cell and placed A.S. and his cellmate in handcuffs." *Id.* A.S. was then escorted to a holding cell in the Special Housing Unit (SHU).

The first assault began. Two officers "lifted A.S. from the ground by his arms and slammed his face against the wall, causing A.S. to lose consciousness and half of his two front teeth." *Id.* When he regained consciousness, he was lying on the ground being kicked "by several officers." *Id.* While A.S. "screamed in pain and for mercy," the officers kicked his "head, face, genital area, back, arms, and legs." *Id.* The officers also called him sexually explicit names and racial slurs. This assault lasted for three to five minutes. A few minutes later, another officer entered the cell and "began kicking A.S.'s body." *Id.* After he stopped, two other officers "took over." *Id.* A.S. "lay on the ground" in a "submissive state" throughout the series of attacks. *Id.*

After these attacks ceased, USP Lee's warden "threatened A.S. with more violence in the event he reported any injuries to medical staff." *Id.* ¶ 48. Then, Nurse Spencer Bowman came in and "assessed" A.S. *Id.* Because of the threats, A.S. obeyed the warden and "did not report any injuries to Nurse Bowman." *Id.* Indeed, Nurse Bowman's report, cosigned by Dr. Vibeke Dankwa, states that A.S. "did not make any statement of injury nor occurrence." *Id.* However, the report also

notes that A.S. was "involved in a physical altercation in SHU" and had an "abraded inner lower lip, red marks to forehead and[] abrasions to both elbows." *Id.*

After the "medical assessment" occurred, A.S. claims that he remained "in significant pain." *Id.* ¶ 49. He was soon brought back to his original SHU cell with a new cellmate. A.S. alleges that his cellmate "turned to [him] and explained that staff placed him in the cell with instructions to attack A.S." *Id.* A.S. then "feigned throwing a punch at the new cellmate" in an attempt to appease the officers. *Id.* An officer then handcuffed A.S. and moved him "back to the same holding cell where he had been attacked earlier that day." *Id.* ¶ 50. A.S. was told to kneel on the "suicide mat" and was placed in "ambulatory restraints." *Id.*

The next assault then began. An officer "ripped chunks of A.S.'s mace-covered beard out of his face and shoved the handfuls of mace-covered hair in A.S.'s mouth, causing A.S. to choke." *Id.* ¶ 51. The group of officers then resumed punching and kicking A.S. while he was restrained. An officer "grabbed A.S.'s penis and testicles and mutilated his genitals by squeezing and twisting." *Id.* ¶ 52. The officer squeezed hard enough for A.S.'s "penis to begin bleeding, which caused A.S. to scream in agony." *Id.* Two other officers "forced A.S.'s face into the ground to combat the volume of his screams." *Id.*

When the officers stopped the attack, "blood from A.S.'s penis formed a pool of blood on the cell floor." *Id.* ¶ 53. A.S. alleges that an officer who was watching

the assault from outside the cell "noticed and pointed out the blood." *Id.* An officer then retrieved a mop and "mopped the pool of blood." *Id.* One of the officers then "wiped the head of the blood-soaked mop on A.S.'s face" while the other one "field goal-kicked A.S. in his genitals." *Id.* This caused A.S. "extreme pain." *Id.*

An officer then commented, "[s]ince he likes touching little kids, we should put the broom up his ass." *Id.* ¶ 54. Two officers "grabbed A.S. on either side of his body and held him against the wall." *Id.* ¶ 55. A third officer "rammed the wooden mop handle through the seat of A.S.'s pants, penetrating several inches inside A.S.'s anus." *Id.* The officer then "forced the mop handle to an even deeper depth inside A.S.'s anus, while A.S. screamed for mercy." *Id.* This "lasted for about ten seconds." *Id.*

A.S. was left alone in the cell, "lying on the floor, defeated, bleeding, and in excruciating pain." *Id.* ¶ 56. About five minutes later, officers entered the cell to prepare A.S. for another medical examination. They again threatened him "with further violence if [he] reported any injuries during the medical assessment." *Id.* A.S. was "all but carried" to the adjacent cell for the medical assessment. *Id.* A.S. alleges that "Nurse Bowman had been waiting for him throughout his sexual assault" to conduct the medical exam. *Id.* ¶ 57. At the medical exam, A.S. "could not sit up" and remained "bent over." *Id.* When Nurse Bowman asked if he had any injuries, A.S. complied and "reported that he had none." *Id.* Even though there was "blood

leaking through both the front and the seat of his pants, Nurse Bowman ended the assessment." *Id.* Nurse Bowman's report states that A.S. "did not have any injuries." *Id.* ¶ 58. But A.S. claims that his injuries were obvious, as blood from his "actively bleeding" wounds got on the "white examination paper covering the table where A.S. sat." *Id.*

After the medical assessment, A.S. "experienced more torture at the hands of officers." *Id.* ¶ 59. He was escorted from the medical cell back to the holding cell. During the "restraint checks" that officers completed every two hours, officers "lodged violent attacks on A.S." *Id.* They "would rush into the cell behind a fiberglass shield" and '"bulldoze' A.S. with the shield, using it to pin his body and face against the wall." *Id.* They continued to punch and kick him, as well as pressing the "edge of the shield into the bottoms of A.S.'s feet." *Id.* Officers took turns "pulling his braids from his scalp, slamming his head into the wall . . . and bending his fingers back." *Id.* ¶ 60. The officers continued to "verbally assault[]" A.S. with sexually explicit and derogatory remarks. *Id.* ¶ 63. At one point, an officer "spit on A.S. while he lay on the ground." *Id.* ¶ 62. Another time, two officers had "a contest" for who could throw A.S. furthest, which resulted in A.S. being thrown against the wall "at least eleven times." *Id.* ¶ 68.

During a few of these attacks, "a member of the medical staff . . . stood outside of the cell and waited for a signal to enter." *Id.* ¶ 64. Medical reports note that

A.S.'s "Chief Complaint" concerned an unspecified "Other Problem." *Id.* ¶ 65. According to these reports, A.S. did not have any other injuries during this time. *Id.*

After enduring twenty-four hours of attacks, A.S. was moved back into a "regular SHU cell with a new cellmate, and finally taken out [of the] restraints." *Id.* ¶ 69. A.S. alleges that his new cellmate was "visibly aghast when he saw A.S.'s injuries." *Id.* "Despite the obviousness of his injuries," A.S. claims that he "was not seen or treated by medical personnel for injuries sustained during the assault for more than 40 days." *Id.* ¶ 70. He also alleges that the officers "strategically attempted to cover-up or otherwise launder their abuse," including fabricating incident reports to "justify [their] assaults on A.S. and explain his resulting injuries." *Id.* ¶ 71.

A.S. alleges that he was left with many lingering injuries from the series of attacks he endured. He had "cuts, contusions, and bruises across his body that were extremely painful." *Id.* ¶ 73. His "penis continued to bleed for several days, and his anus continued to bleed for about seven to ten days." *Id.* He had "extreme burning for several days when he urinated." *Id.* He also had "constipation and bloody stools for multiple weeks." *Id.* His lower back and knee injuries also "caused persistent pain for multiple months following the attacks." *Id.* His front teeth remained broken at the time the Complaint was filed. *Id.* ¶ 74. He also continued to suffer from "night

terrors," "hypervigilance," "anxiety," and "panic attacks" because of the "torture" he faced at USP Lee. *Id.* ¶ 75.

II.

Subject-matter jurisdiction refers to whether a court has the power to hear a particular claim. It is a threshold issue that must be addressed before reaching the merits of the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95–102 (1998). The plaintiff bears the burden of showing subject-matter jurisdiction on a Rule 12(b)(1) motion. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

The FTCA provides a limited waiver of the United States' sovereign immunity for certain tort claims. 28 U.S.C. §§ 1346(b)(1), 2674. A plaintiff invoking that waiver must first satisfy the jurisdictional prerequisites Congress prescribed in 28 U.S.C. § 2675. *Van Emburgh ex rel. Estate of Van Emburgh v. United States*, 95 F.4th 795, 800 (4th Cir. 2024). The Fourth Circuit has explained that § 2675's administrative-exhaustion requirement contains "three elements": a claimant must "present" the claim to the appropriate federal agency, state the sum sought, and wait either for a final agency denial or for the agency to fail to make a final disposition within six months after the claim is filed.[2] *Id.* at 801.

[2] It is undisputed in this case that A.S. stated the sum sought in his Standard Form 95 (SF-95), $500,000, and waited until he received the BOP's denial letter before pursuing his claim in federal court. Mem. Supp. Mot. Dismiss, Shaw Decl. Attach. A, SF-95 at 1, Dkt. No. 24-14. The only element at issue is whether he presented the claim properly.

A claim is presented to the appropriate federal agency when the agency receives "an executed [SF-95] or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death." 28 C.F.R. § 14.2(a). The purpose of SF-95 is to put the agency on notice of the facts surrounding the alleged tort, so the agency has sufficient information to investigate the alleged injury and the cause of that injury. *Ahmed v. United States*, 30 F.3d 514, 516–17 (4th Cir. 1994).

If a claim is not raised during the administrative process, suit cannot be brought under the FTCA for that claim and "dismissal is mandatory" for lack of subject-matter jurisdiction. *Henderson v. United States*, 785 F.2d 121, 124 (4th Cir. 1986).

III.

A.S. does not allege sufficient factual information in his SF-95 for his claims for medical malpractice and negligent medical care. A.S.'s SF-95 contains two parts. The first is a description of the "violent assault" where the officers "mutilate[ed]" his genitals and "[r]ammed appx 3 inches of the mop handle in [his] anus." SF-95 at 2, Dkt. No. 24-14. The second is a description of the injuries he suffered.

Although this content is sufficient to provide notice for A.S.'s other claims — assault and battery, negligent use of force, sexual assault and battery, and sexual

abuse by a person of authority — it is not sufficient for his claims related to medical care. A.S.'s SF-95 fails to mention any interactions he had with medical personnel, any deficient medical care he received, or any instances where medical care was withheld. In fact, his SF-95 contains no mention of medical care at all. Thus, any claims related to medical care are outside the scope of his SF-95 and must be dismissed for lack of subject-matter jurisdiction. *See Sinkfield v. United States*, No. 7:22CV00033, 2023 WL 7002168, at *2 (W.D. Va. Oct. 24, 2023) *aff'd,* No. 23-7150, 2025 WL 1431178 (4th Cir. May 19, 2025) (unpublished) (dismissing claims concerning medical care when the SF-95 failed to mention medical care and only included allegations of an injury).

A.S. argues that the descriptions of his abuse and injuries, which he included in his SF-95, should have provided a sufficient factual basis for the BOP to investigate claims related to medical care he received for those injuries. Pl.'s Opp'n Mot. Dismiss, 10–11, Dkt. No. 32. I disagree. Although A.S. describes deficient medical treatment from USP Lee medical personnel in his Complaint, this information was not present in his SF-95. As in *Smith v. United States*, the BOP was not on notice that he would pursue claims related to medical care and had no opportunity to investigate these claims before they were pursued in federal court. No. 6:23-cv-00078, 2024 WL 4218850, at *10 (W.D. Va. Sept. 17, 2024)

(dismissing claims for medical malpractice where the complaint included additional allegations, but insufficient medical care was not raised in the SF-95).

For the reasons stated, I conclude that A.S. has failed to properly exhaust claims related to medical care as required under the FTCA. As such, this court lacks subject-matter jurisdiction to hear the medical malpractice and medical negligence claims. Moreover, A.S. could not now complete the FTCA exhaustion process. An FTCA claim must be "'presented' to the appropriate agency within two years after the claim accrues." *Ahmed*, 30 F.3d at 516 (quoting 28 U.S.C. § 2401(b)).

IV.

For the reasons stated in this Opinion, it is **ORDERED** that the Motion to Dismiss, Dkt. No. 23, is GRANTED and Counts Two and Four of the Complaint are dismissed with prejudice.

V.

The defendant United States must file an Answer to the remaining claims within 14 days. Thereafter, the court intends to hold a Scheduling Conference. The parties must confer under Rule 26(f) before the Scheduling Conference and file a Report outlining a Discovery Plan. The Report must also include matters appropriate to a Scheduling Order under Rule 16, including a deadline for completion of discovery, deadlines for disclosure of expert testimony, any needed

Protective Orders, deadlines for filing of motions for summary judgment, and a suggested date and length of trial.

ENTER: November 9, 2026

/s/ JAMES P. JONES
Senior United States District Judge